IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANET PEREZ, | ) | CASE NO. 1:18-CV-833 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Janet Perez ("Perez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

As explained more fully below, the ALJ did not sufficiently explain her reasons for discounting Perez' statements regarding her intermittent symptoms stemming from her relapsing-remitting multiple sclerosis. Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

Perez protectively filed applications for DIB and SSI in December 2014, alleging a disability onset date of September 24, 2013. Tr. 17, 209, 215. She alleged disability based on the following: multiple sclerosis, depression, and vertigo. Tr. 242. After denials by the state agency initially (Tr. 110, 111) and on reconsideration (Tr. 142, 143), Perez requested an administrative hearing. Tr. 166. A hearing was held before an Administrative Law Judge

1

("ALJ") on February 8, 2017. Tr. 38-75. In her May 25, 2017, decision (Tr. 17-32), the ALJ determined that Perez can perform her past relevant work, i.e. she is not disabled. Tr. 30. Perez requested review of the ALJ's decision by the Appeals Council (Tr. 208) and, on February 12, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Perez was born in 1970 and was 43 years old on her alleged onset date. Tr. 209. She has an associate's degree in accounting. Tr. 43. She previously worked as a customer service representative for a car dealership, a bookkeeper, and an interpreter. Tr. 43-45.

### B. Relevant Medical Evidence

On May 5, 2014, Perez saw her primary care provider Juan Noberto, M.D., complaining of dizziness and falling. Tr. 399. Her physical exam findings were normal. Tr. 401-402. Dr. Noberto referred her to a neurologist. Tr. 399, 403.

On May 30, 2014, Perez saw neurologist Darshan Mahajan, M.D. Tr. 394. Her chief complaint was dizzy spells for the last six months, gait ataxia, and three fainting spells that occurred when she changed her posture. Tr. 394. She also complained of trouble with focus, concentration and anxiety. Tr. 394. She described that, when she turned her head to look at a sign, she could not read the sign because she could not focus. Tr. 394. While she was working, she would get dizzy and fall about once a week and she tried to hold on to things to prevent the falls. Tr. 394. She had vertigo when she would get up from bending forward. Tr. 394. She had been in an auto accident on April 14 and had right lower back pain. Tr. 397. A neurological exam was normal, including normal speech and orientation, normal vision, normal sensory and

reflex exams, normal muscle tone and mass, no pronation or drift, normal gait and coordination, no involuntary movements, and full muscle strength. Tr. 396. Dr. Mahajan diagnosed dizziness and giddiness, benign paroxysmal vertigo, and abnormality of gait and ordered further testing, physical therapy for her dizziness, and to follow up in a month or two. Tr. 396-397.

On August 6, 2014, Perez followed up with Dr. Mahajan. Tr. 417. She reported that her dizziness had not improved but she had not had any fainting spells since her last visit. Tr. 417. Most of her vertigo and dizziness occurred when she turned to the left side. Tr. 417. She had not gotten her MRI (it had not been approved by insurance), lab testing, or started physical therapy. Tr. 417. She did get an electronystagmography (ENG), which was abnormal; an electroencephalogram (EEG), which was normal; and a posturography, which was abnormal. Tr. 417. Her ENG showed peripheral vestibular dysfunction. Tr. 417. A neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 418. Dr. Mahajan advised she stop smoking and emphasized she do physical therapy. Tr. 417, 419.

On October 1, 2014, Perez returned to Dr. Mahajan. Tr. 413. She was doing relatively well: she reported rare dizziness, no fainting spells, and balance issues with falls. Tr. 413. She had gotten an MRI and lab testing but had not done physical therapy due to transportation issues. Tr. 413. She was scheduled for a spinal tap and an evoked potential study. Tr. 413. Her lab testing was normal and her MRI was abnormal, showing a possibility for demyelinating disease. Tr. 413. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 415. Her evoked potential study was done on October 21, 2014, and her visual evoked potential showed that, upon stimulation, both eyes showed a response that was poorly developed and delayed in

latency. Tr. 480. Her somatosensory evoked potentials were "difficult and seem abnormal." Tr. 480.

On November 26, 2014, Perez saw Dr. Mahajan for a follow up. Tr. 409. She reported daily dizziness when she looked to the side, balance issues with falls, and no fainting spells. Tr. 409. Her spinal fluid was suggestive of demyelinating disease. Tr. 409. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 410. Dr. Mahajan stated that Perez had been diagnosed with multiple sclerosis this month. Tr. 411. He wrote that she had a positive Lhermitte's sign,[1] intermittent diplopia (double vision), and vertigo, which was mostly postural. Tr. 411. He stated that she needs to do her exercises. Tr. 411. He started her on a drug used to treat the relapsing form of multiple sclerosis and again ordered physical therapy. Tr. 411.

On March 11, 2015, Perez had a follow-up appointment with Dr. Mahajan. Tr. 584. She reported doing all right since her last visit; her dizziness and vertigo had been okay but she was still having spells. Tr. 584. Her walking and balance were the same; "she has had only one fall since last seen." Tr. 584. She had not been going to physical therapy. Tr. 584. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 586. Dr. Mahajan stated that she was to return in a month or two and again emphasized that she do her exercises. Tr. 587.

On April 16, 2015, Perez had a psychological consultative examination with James N. Spindler, M.S. Tr. 589. She drove to the exam herself, arrived on time, and had no difficulty finding the office. Tr. 590. She stated that she lost her last job in customer service in 2013 when

---

[1] A Lhermitte's sign is "the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward"; it is seen mainly in people with multiple sclerosis. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1713.

4

she was hospitalized and treated for depression. Tr. 591. She stated that she could not work because she can't seem to focus. Tr. 591. Dr. Spindler stated that her gait appeared normal but noted that Perez stated she fell a lot. Tr. 591. Perez spoke clearly at a normal rate and volume, had adequate thought associations, and had no apparent difficulty staying focused during the exam. Tr. 592. She maintained eye contact. Tr. 592. She reported that she often chokes on her food. Tr. 592. She did not sleep well and reported a poor energy level. Tr. 592. Upon exam, she was alert, oriented, able to recall five objects after five minutes, recite six digits forward and four digits backward, and appeared to be functioning in the average range of intelligence. Tr. 592. She reported shopping for food, clothing, and other items and maintained a checking account and Dr. Spindler opined that her judgment seemed reliable for most routine matters. Tr. 593. She described a typical day as up by seven, waking her 12-year-old twins, preparing breakfast for them, and getting them off to school on time. Tr. 593. She may wash dishes, clean the bathroom and floors, and do a load of laundry. Tr. 593. She rarely took naps during the day. Tr. 593. Her psychotropic medications helped, although she still felt depressed and anxious. Tr. 593. She followed sports and liked to watch her favorite television programs. Tr. 593. She enjoyed talking to a friend. Tr. 593. She prepared dinner for herself and sons and helped them with their homework. Tr. 593. After that she would watch television if she did not have a migraine. Tr. 593. Dr. Spindler opined that she seemed capable of understanding, remembering and carrying out instructions in most job settings, could sustain a working pace and maintain a sufficient level of attention and concentration in most job settings, and seemed likely to respond appropriately to routine work pressures. Tr. 595.

On July 15, 2015, Perez returned to Dr. Mahajan for a follow up. Tr. 624. She had been having problems with her injections and wanted to discuss oral medication. Tr. 624. She stated

5

that her eyes were jumping the last two months and she had had two falls since her last visit. Tr. 624. She had an eye exam two months ago and new glasses. Tr. 624. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 626. Dr. Mahajan ordered an MRI and physical therapy. 627.

On September 2, 2015, Perez returned to Dr. Mahajan for a follow up visit. Tr. 628. She reported that she had been ok; her balance was off and she had had one fall. Tr. 628. She stated that she had been feeling dizzy and was under a lot of stress. Tr. 628. Her MRI results were consistent with multiple sclerosis. Tr. 628. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 630. Dr. Mahajan wrote that her diplopia had gotten better. Tr. 631.

On December 9, 2015, Perez saw Dr. Mahajan for a follow up visit. Tr. 632. She reported bad back pain, being off balance, and having falls. Tr. 632. Her neurological exam was normal: alert, intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 634. Dr. Mahajan's impressions were multiple sclerosis symptoms starting in 2010, diagnosis made in 2014; gait ataxia, falls, and Lhermitte's sign; diplopia; hypertension; postural dizziness; depression and anxiety; and low back pain. Tr. 635.

On August 24, 2016, Perez returned to Dr. Mahajan for a follow up. Tr. 707. Perez reported that she was stressed, currently homeless, and still falling and bumping into things. Tr. 707. She had not done physical therapy. Tr. 707. Her neurological exam was normal: intact speech and comprehension, normal swallowing, clear vision, maintained strength, good balance and ambulating well. Tr. 709. Dr. Mahajan wrote that she has had multiple sclerosis, remitting

6

and relapsing since 2010 but diagnosed in 2014, she was doing well with her medication, she is aware she needs to do her exercises regularly, "when she hurries she has lost her balance and fallen, she needs to start taking her time. Her gait ataxia and falls are better," she had a positive Lhermitte's sign on the left side, hypertension, diplopia, stress incontinence, and postural dizziness. Tr. 709-710.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinions

On August 19, 2015, Dr. Mahajan wrote a letter stating that Perez "is permitted to only do office work with the jobs program due to her medical condition." Tr. 715.

On February 6, 2017, Christina Kolp, M.D., completed a medical source statement on behalf of Perez. Tr. 701-702. Dr. Kolp opined that Perez could perform less than six hours of sedentary work a day due to complications from multiple sclerosis. Tr. 701. She could stand or walk less than 15 minutes at a time, sit for 30 minutes at a time, and occasionally lift/carry five pounds or less, due to multiple sclerosis. Tr. 701. She could rarely finger and handle and could occasionally reach and would need to lie down two hours or more in an eight-hour workday. Tr. 701. She had neurological complications from her medication. Tr. 701. She would likely be absent three days a month and off task more than 33% of the time due to an inability to concentrate. Tr. 702.

#### 2. State Agency Reviewer Opinions

On May 5, 2015, state reviewing physician Abraham Mikalov, M.D., reviewed Perez' record and opined that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Tr. 87-88. She could push and/or pull the same as that shown for lift

7

and/or carry, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally balance and stoop, frequently kneel, crouch, and crawl, and must avoid all exposure to hazards such as machinery and heights. Tr. 88-89. On September 14, 2015, state agency reviewing physician Elizabeth Das, M.D., reviewed Perez' record and adopted Dr. Mikalov's opinion with the following, additional restrictions: Perez could stand and/or walk four hours in an eight-hour workday, had no kneeling limitations, and could occasionally crouch and crawl. Tr. 122-123.

### D. Report to Social Security Office

On January 29, 2015, Perez had telephone contact with the Social Security Administration and reported that she falls frequently, has blurry vision, the right side of her face is numb, and her knees and hands are shaky. Tr. 249. She has to hold onto walls and counters to move around because she is afraid of falling and holds on to rails in the shower. Tr. 249. She cooks and is able to do dishes (she uses a chair to sit down to do them) and laundry but hanging up clothes causes her to get dizzy and her children have to help her. Tr. 249. She can sweep with her back to the wall but cannot mop. Tr. 249. Her kids help take out the garbage and do household cleaning. Tr. 249. She has short-term memory problems. Tr. 249. She likes to read but can only read two pages at a time and then forgets what she was reading; she doesn't read as much anymore. Tr. 239. She burns food frequently because she goes to do something else and forgets she was cooking. Tr. 249. She was depressed, had constant sadness and crying spells, and was forgetful and lacked motivation. Tr. 249.

### E. Testimonial Evidence

#### 1. Perez' Testimony

Perez was represented by counsel and testified at the administrative hearing. Tr. 41-64.

She lives with her adult daughter, her daughter's fiancé and two small children, and Perez' 12-year-old twin boys. Tr. 47. She is able to drive and drove herself to the hearing, although she got lost on the way. Tr. 46. Her grandchildren go to daycare; Perez is unable to watch them. Tr. 48. During the day, she does "a little dishes" and laundry but the laundry stays in the machine until her twins come home from school and bring it up to the room so she can fold it. Tr. 48. She spends time reading. Tr. 48. She sits outside when she can and she goes grocery shopping with her daughter. Tr. 48. She has a laptop but her grandchild broke it; before then, she would use it to make her welfare interim reports, her "LMH" application, and to read. Tr. 49.

Perez stated that her main diagnosis that she is concerned about with respect to disability is her multiple sclerosis: vertigo, falling, her inability to control her bladder and bowel movements. Tr. 49. She started experiencing symptoms during the time she was working at her last job. Tr. 49. That was the first time she fell down the stairs, and once she had to go to the hospital during her lunch break because her chest hurt from an anxiety attack. Tr. 49. Then she had a car accident and that is when they found she had multiple sclerosis causing the falling and her eyesight to jump. Tr. 50.

Once she received her diagnosis, Perez began taking pills for vertigo that help keep her in balance. Tr. 50. She is on medication for the fatigue, depression, and she takes vitamin D. Tr. 50. She injects herself every other day with medication for her multiple sclerosis. Tr. 50. She still has dizzy spells but without her medication she would get dizzy every time she got out of bed and fall, whereas with the pills she hasn't fallen in four or five months. Tr. 51. She described her vertigo as like a dizziness and blurriness; she can't look fast to the left or right and she has to stop and pause and refocus. Tr. 51. The same thing happens with her reading because her eyesight is jumping. Tr. 51. She has vertigo episodes three to five times a week. Tr. 51.

9

When she takes her medication for her fatigue it helps her be more alert and awake. Tr. 52. When asked if she still experiences episodes of fatigue while taking her fatigue medication she answered yes. Tr. 52.

When asked about the depression she experiences as a result of her multiple sclerosis Perez stated that, since she has been diagnosed with MS, she feels useless. Tr. 52. Her attorney requested the ALJ take judicial notice of a Wikipedia article that lists the symptoms of multiple sclerosis and proceeded to go through the listed symptoms in the article with Perez. Tr. 53. He asked her how she feels about her cognitive impairment, a listed symptom, and Perez asked what a cognitive impairment was. Tr. 53. The attorney explained that it is her ability to solve problems, multitask, and concentrate. Tr. 53. Perez stated that she can't multi-task because she has to focus and her short-term memory is a big deal because she forgets a lot of things. Tr. 53. If she is cooking and has to use the bathroom she will forget she was cooking and something burns. Tr. 53. When asked about anxiety Perez stated that she has anxiety. Tr. 53-54. When asked about mood swings and rapid shifts in mood Perez answered she has these and explained that she could be perfectly fine, go get a cup of something, trip or go to the side and hang onto the dining room table, and then her mood changes. Tr. 54. When asked to talk about the weaknesses that she feels in her muscles, Perez stated, "my legs." Tr. 54. They are constantly shaky and she always or pretty much walks while hanging onto something in case she goes either way. Tr. 54. When asked if she experiences spasms Perez stated that sometimes she does in her legs because she tries to exercise and stretch during physical therapy and the stretches cause a hard spasm in the back of her leg. Tr. 54. When asked if she experienced ataxia, defined as the loss of full control of body movements, Perez answered that she does. Tr. 55. She stated that she has scars on her legs and elbows from the times she has fallen and she has had to leave a

10

birthday party for example because she "couldn't control." Tr. 55. When asked about pain Perez stated that she feels it mainly in her lower back, on her waist where she has bone deterioration. Tr. 55. The pain is a sharp, poking pain and it is difficult to sleep because she has to turn from one side to the other. Tr. 55.

Perez' attorney asked her about hypoesthesias, which he described as a reduced sense of touch or sensation, and Perez asked if that is when her legs or hands fall asleep. Tr. 55. Her attorney confirmed it was and she stated that it causes her to not sleep well. Tr. 56. When asked how often her hands fall asleep Perez stated that it mainly happens when she is still. Tr. 56. She can't babysit her grandchildren, because if she has to carry the baby up to the crib to change a diaper, she is afraid she will drop her because of her hands and legs and she can't do it. Tr. 56. When asked if she has ever lost her sense of touch in her hands when in a seated position Perez stated that she remembers a Thanksgiving when they were sitting, and that she feels a tingling in her fingers when the numbness first starts going away. Tr. 56. Her attorney asked her whether she has paresthesias, a burning or prickling sensation usually in the hands, arms, legs or feet, and Perez stated that she feels that sensation in her legs and back. Tr. 57. She rarely has trouble swallowing. Tr. 57. When asked if she ever had repetitive, uncontrolled eye movements Perez stated that she does; in addition to having an astigmatism, her eyesight jumps. Tr. 57. She tried taking online college courses to finish her bachelor's degree in accounting but she couldn't because of the jumping. Tr. 57. "Reading a paragraph, it just got to start over," and when she figured it out using an eraser to help her read she did not realize that the online tests were timed and she could not do that. Tr. 57. She was not aware if she had inflammation of her optic nerve. Tr. 57. She has had double vision problems and the last time she got her glasses she needed bifocals for reading. Tr. 57-58. When asked if she ever noticed a problem with slowed or

11

slurred speech Perez stated that she does not think she slurs but that she does have to stop and think what she is going to say. Tr. 58. She has experienced incontinence for the past year. Tr. 58. Once she gets that first sensation she knows that she has seven seconds to walk and go to the bathroom. Tr. 58. She is constantly wearing overnight pads. Tr. 58. In two weeks she has an appointment with a urologist and she is hoping they will solve this problem. Tr. 59.

When asked what her doctors are now telling her about her multiple sclerosis, Perez answered that the second MRI showed degenerative bone loss "on her waist." Tr. 59. There is a little piece that is "holding that to my waist" and if that piece were to break she would be in a wheelchair for the rest of her life. Tr. 59. That is why she is afraid to "walk like this" because she does not want to be in a wheelchair. Tr. 60. When asked about her balance, Perez stated that even with a cane she is still going to fall because she falls to the left or right side and can't switch the cane from one hand to another. Tr. 60. Lately, when she walks, she has her twins on either side of her and holds their elbows; as long as she is holding onto something "I feel like, you know." Tr. 60. Sometimes one of her sons complains that she is pulling him to the left. Tr. 60. But if she holds onto something she can walk. Tr. 60. She also has arthritis and her knees grind and she has chest pain from anxiety. Tr. 60.

Perez stated that she thought she could stand in one position for 10 or 15 minutes without using a cane. Tr. 61. She uses a cane whenever she walks distances. Tr. 61. Around her house she will walk with her hands on the walls, rails, dining room table, cabinet, etc.; she just hangs on to anything. Tr. 61. The cane is from her sister's mother-in-law, who no longer needs it. Tr. 61. She hasn't told her doctor anything about using a cane. Tr. 61. She is seeing him in a few days and does not think he would have a problem with that. Tr. 61. She would rather have a walker so she can balance on both sides. Tr. 61-62. Also, her knees give in. Tr. 62. She thinks

she could repeatedly lift five to seven pounds. Tr. 62. She can type very little due to her eyesight "jumping to the keyboards everywhere, the letters," and she could not open jars because it hurts to make pressure. Tr. 62. She can sit for three to four hours but cannot do so at one time because she will have to go to the bathroom and when she has to go to the bathroom she has to get up and go. Tr. 63.

When asked why she could not do her past work, Perez stated that she definitely cannot sit in front of a computer for eight hours reading because her eyesight will be jumping and, doing accounting work, you have to be responsible and careful and she can't. Tr. 63. The reason she could not sit and answer phones is because what if she is on the phone and has to go to the bathroom? Tr. 63-64. She would have to hang up or put the person on hold. Tr. 64.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 64-71. The ALJ discussed with the VE Perez' past work. Tr. 65-66. When asked whether a hypothetical individual with Perez' age, education and work experience could perform her past work if that person had the limitations assessed in the ALJ's RFC determination, the VE answered that such an individual could perform Perez' past work as a customer service representative, accounting clerk, bookkeeper, and interpreter. Tr. 66-67.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her May 25, 2017, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2017. Tr. 20.

2. The claimant has not engaged in substantial gainful activity since September 24, 2013, the alleged onset date. Tr. 20.

3. The claimant has the following severe impairments: multiple sclerosis, vestibular system disorders, and obesity. Tr. 20.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 22.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can stand and/or walk for four hours in an eight-hour workday and sit for six hours in an eight-hour workday. She can occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds, and occasionally balance, stoop, crouch, and crawl. The claimant must avoid all exposure to hazards, such as industrial machinery and unprotected heights. Tr. 23.

6. The claimant is capable of performing past relevant work as a customer service representative, accounting clerk, bookkeeper, and interpreter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 30.

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 24, 2013, through the date of this decision. Tr. 31.

## V. Plaintiff's Arguments

Perez argues that the ALJ's reasons for assessing Perez' pain and other symptoms such as visual impairment and slowed thought process are insufficient because the ALJ failed to recognize the episodic nature of Perez' multiple sclerosis, mischaracterized her activities of daily living, and incorrectly assessed Dr. Mahajan's opinion. Doc. 15, pp. 11-16.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Perez argues that the ALJ erred when assessing her pain and other symptoms (visual impairment and slowed thought process) in violation of Social Security Ruling 16-3p, 2016 WL 1119029. Doc. 15, p. 11. She quotes the following passage from SSR 16-3p:

> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

Doc. 15, p. 11. She asserts that she testified about her problems with dizziness, not being able to look fast to the left or right and having to stop and refocus (i.e., her diplopia), her inability to

multi-task, and her short-term memory problems, but that the ALJ failed to account for her visual impairments and slowed thought process. Doc. 15, pp. 11-12.

The Court agrees. The ALJ did not explain why or whether she discounted Perez' statements regarding her visual impairments and this Court cannot, therefore, assess the ALJ's evaluation. To be sure, Perez' statements were not altogether consistent regarding her relevant activities of computer use and reading (e.g., Tr. 49 (she uses her computer to perform necessary tasks like completing her interim reports for welfare and to read); Tr. 57 (she had problems taking online courses due to problems with timed tests); Tr. 62 (she could not look at a computer all day because of her eyes jumping); Tr. 48 (during the day she likes to read and spends time reading); Tr. 249 (she does not read much anymore because she forgets what she reads); Tr. 593 (she helps her children with their homework)). But the ALJ did not explain why she apparently discredited Perez' visual symptoms, other than to recite that she had clear vision when she saw Dr. Mahajan, which is not sufficient to explain why she discredited Perez' intermittent multiple sclerosis symptoms of diplopia and her eyes jumping. *See Anderson v. Comm'r of Soc. Sec.*, 440 F.Supp.2d 696, 699-700 (E.D. Mich. July 27, 2006) (a remitting relapsing form of MS requires the ALJ to perform an evaluation that includes an assessment of what the claimant could do during multiple sclerosis exacerbations). The ALJ gave great weight to Dr. Mahajan's opinion that Perez could perform "only office work with the jobs program" but there is nothing in the record or in the ALJ's decision explaining what the jobs program is and what such work would entail. An assessment of Perez' diplopia is critical because the ALJ found that Perez could perform her past work as an accounting clerk and bookkeeper, both of which require significant computer use and close interaction with documents. In short, the ALJ did not sufficiently articulate her reasons for discounting Perez' alleged visual symptom stemming from her

remitting relapsing form of multiple sclerosis; accordingly, the Court cannot determine whether her decision is supported by substantial evidence.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion

IT IS SO ORDERED.

Dated: February 26, 2019

 */s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge